UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THE PARISH OF PLAQUEMINES                    CIVIL ACTION

VERSUS                                       NO: 13-6693

TOTAL PETROCHEMICAL &                        SECTION: "A" (2)
REFINING USA, INC., ET AL.

**ORDER AND REASONS**

Before the Court is a **Motion to Remand (Rec. Doc. 31)** filed by plaintiff

Plaquemines Parish, on its own behalf and on behalf of the State of Louisiana. Defendants

oppose the motion.[1] The Parish filed its reply and counsel orally argued the motion on July

2, 2014. (Rec. Docs. 55 & 64). The Court ordered supplemental briefing and both sides have

now responded with several additional submissions. (Rec. Docs. 68, 69, 72, 75, 78, 82). The

Court commends counsel for both sides on their excellent memoranda.

Having now considered the applicable law, the evidence of record, and the arguments

of counsel, the Court concludes that the Motion to Remand should be GRANTED.

I.    **Factual Background**

The Parish of Plaquemines ("the Parish") filed suit on its own behalf and on behalf of

the State of Louisiana against 19 separate defendants,[2] some of whom are not diverse in

---

[1] Defendants BP America Production Co., Burlington Resources Oil & Gas Co. LP, Exxon
Mobil Corporation, Shell Oil Co., Shell Offshore, Inc., Chevron U.S.A. Inc., Chevron U.S.A.
Holdings, Inc., Chevron Pipe Line Co., and The Texas Co. have taken the lead on opposing the
motion to remand. Defendants LLOG Exploration & Production Co. and Clayton Williams
Energy, Inc. join in the opposition. (Rec. Docs. 47 & 50).

[2] The following entities are joined as defendants: Total Petrochemical & Refining USA,
Inc., BP America Production Company, Burlington Resources Oil & Gas Company LP, Chevron
U.S.A., Inc., Clayton Williams Energy, Inc., Delta Development Company, Inc., Devon Energy
Production Company, L.P., Dimension Energy Company, L.L.C., Pioneer Natural Resources

citizenship from the Parish.[3] The Parish relies solely on a body of Louisiana state law called the State and Local Coastal Resources Management Act of 1978, La. R.S. § 49:214.21, *et seq.*, ("the CZM Laws" or "SLCRMA"), along with the state and local regulations, guidelines, ordinances, and orders promulgated thereunder. The CZM Laws regulate certain "uses" within the Coastal Zone of Louisiana through a permitting system.[4] *See* La. R.S. § 49:214.30. The CZM Laws prohibit anyone from engaging in a "use" without first applying for and receiving a coastal use permit. A "use" is any activity within the Coastal Zone which has a direct and significant impact on coastal waters. La. R.S. § 49:214.23(13). The CZM Laws further divide "uses" within the Coastal Zone into uses of *state* concern and uses of *local* concern. La. R.S. § 49:214.25(A). The State issues permits relating to "uses of state concern" in the Coastal Zone, and local governments with "approved programs" issue permits for "uses of local concern."

Generally, the Parish alleges that certain of Defendants' oil and gas exploration, production, and transportation operations associated with the development of the Coquille Bay, Delta Duck Club, Grand Bay, Main Pass Block 47, Main Pass Block 69, Raphael Pass, and Romere Pass Oil & Gas Fields in Plaquemines Parish were conducted in violation of the CZM Laws, and that these activities caused substantial damage to land and waterbodies located in the Coastal Zone within Plaquemines Parish. (Petition ¶ 3). The term "Operational

---

USA, Inc., June Energy, Inc., Exxon Mobil Corporation, Shell Offshore, Inc., Shell Oil Company, Chevron U.S.A. Holdings, Inc., Texas Petroleum Investment Company, Anadarko E&P Onshore, LLC, Chevron Pipe Line Company, The Texas Company, and LLOG Exploration & Production Company, LLC.

[3] The non-diverse defendants are: Delta Development Co., Inc., Dimension Energy Co., LLC, and June Energy, Inc.

[4] Exhibit A to the Petition is a map of the entire Coastal Zone of Louisiana.

Area" is used throughout the Petition to describe the geographic extent of the area within which the complained-of operations and activities *at issue in this action* occurred. (*Id.*).The Operational Area for this action comprises the geographic regions identified on the maps contained in Exhibit B to the Petition.[5]

The Parish seeks all damages and remedies appropriate under the CZM Laws, including but not limited to, restoration and remediation costs; actual restoration of disturbed areas to their original condition; costs necessary to clear, revegetate, detoxify and otherwise restore the affected portions of the Plaquemines Parish Coastal Zone as near as practicable to its original condition; declaratory relief; litigation costs and expenses and attorney's fees. (Petition ¶ 34). The Parish does not seek injunctive relief. (*Id.* ¶ 33(w)).

## II.    Procedural Background

This lawsuit was originally filed in state court in the Parish of Plaquemines. The Parish's well-pleaded complaint ostensibly seeks relief only under the CZM Laws. In fact, in paragraph 33 of the Petition the Parish disavows at great length any other type of claim, cause of action, or legal theory potentially cognizable on the facts alleged, including any that could form the basis for jurisdiction in a federal court. Again, the parties are not completely diverse in citizenship.

Defendants nonetheless removed the action to this Court alleging four bases for original jurisdiction in federal court:1) diversity jurisdiction; 2) Outer Continental Shelf

---

[5] It is the Court's understanding that the 28 actions now pending in this district have identical petitions. The exhibits to those petitions define the specific Operational Area and permits at issue in each action.

Lands Act; 3) general maritime law; 4) federal question (federal enclave).[6]

The Parish now moves to remand the case to state court.

## III.    Removal—General Governing Principles

A defendant's right to remove is strictly statutory in nature. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir. 1995); *Syngenta Corp. Protection, Inc. v. Henson*, 537 U.S. 28, 32 (2002) (citing *Great N. R. Co. v. Alexander*, 246 U.S. 276, 280 (1918)) ("The right of removal is entirely a creature of statute."). The general removal statute governing civil actions provides:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have ***original*** jurisdiction, may be removed by the defendant or the defendants . . . .

28 U.S.C.A. § 1441(a) (emphasis added).

Per § 1441(a), a defendant may remove a state court action to federal court only if the action could have originally been filed in federal court. *Aaron v. Nat'l Union Fire Ins. Co.*, 876 F.2d 1157, 1160 (5th Cir. 1989) (citing *Caterpillar v. Williams*, 482 U.S. 386, 391-92 (1987); 28 U.S.C. § 1441). Thus, the propriety of removal is keyed to the original jurisdiction of the federal district courts, *Carpenter*, 44 F.3d at 366, and consideration of a motion to remand a case removed from state court presents issues of subject matter jurisdiction and statutory construction, *id.* at 365 (citing *Garrett v. Commonwealth Mortg. Corp. of Am.*, 938 F.2d 591, 593 (5th Cir. 1991)).

The burden of establishing subject matter jurisdiction in federal court rests with the

---

[6] Defendants originally asserted six grounds for removal. Defendants have voluntarily withdrawn two of their grounds for removal of this civil action—the Class Action Fairness Act and the Natural Gas Act—after further investigation and consideration of intervening case law. (Rec. Doc. 46 n.1).

party seeking to invoke it. *St. Paul Reinsur. Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998) (citing *Gaitor v. Penninsular & Occidental Steamship Co.*, 287 F.2d 252, 253-54 (5th Cir. 1961)). Consequently, in a removed case the removing defendant bears the burden of establishing that federal jurisdiction exists. *DeAguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995) (citing *Gaitor v. Penn. & Occid. S.S. Co.*, 287 F.2d 252, 253-54 (5th Cir. 1961)). Because federal courts are courts of limited jurisdiction by origin and design, the presumption is that a federal court is without jurisdiction unless "the contrary appears affirmatively from the record." *Oliver v. Trunkline Gas Co.*, 789 F.2d 341, 343 (5th Cir. 1986) (quoting *King Bridge Co. v. Otoe County*, 120 U.S. 225 (1887)).

The statutory and constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining federal courts from acting at certain times. *Steel Co. v. Citizens for a Better Envir.*, 523 U.S. 83, 101 (1998) (citing *United States v. Richardson*, 418 U.S. 166 (1974); *Schlesinger v. Reserv. Comm. to Stop the War*, 418 U.S. 208 (1974)). "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which (a federal) statute has defined." *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 212 (1971) (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934)). Because the effect of removal is to deprive the state court of an action properly before it, removal raises significant federalism concerns. *Carpenter*, 44 F.3d at 365-66 (citing *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 809 (1986)). Therefore, the removal statutes must be strictly and narrowly construed. *See Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002)). Any doubt regarding whether removal jurisdiction is proper should be resolved against exercising federal jurisdiction. *Acuna v. Brown & Root, Inc.*, 44

5

F.3d 335, 339 (5th Cir. 2000) (citing *Willy v. Coastal Corp.*, 855 F.2d 1160, 1164 (5th Cir. 1988)).

The well-pleaded complaint rule places even further restrictions on a defendant's ability to remove a case from state court. *Aaron*, 876 F.2d at 1160. The rule provides that the plaintiff's properly-pleaded complaint governs the jurisdictional determination and if on its face such a complaint contains no issue of federal law then there is no federal question jurisdiction. *Id.* at 1161 (citing *Franchise Tax Bd. v. Laborers Vac. Trust*, 463 U.S. 1, 10 (1983)); *Venable v. La. Workers' Comp. Corp.*, 740 F.3d 937, 942 (5th Cir. 2013)). The court must look only to "what necessarily appears in the plaintiff's statement of his own claim." *Venable*, 740 F.3d at 942 (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)). Because the plaintiff is "master of the claim" he may plead his case to depend on state law exclusively and thereby defeat attempts at removal. *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 367 (5th Cir. 1995) (citing *Caterpillar*, 482 U.S. at 391 & n.7).

## IV.   Discussion

With the foregoing guiding principles in mind, the Court turns to the merits of the removing Defendants' specific grounds for removal.

### 1)   Diversity Jurisdiction

District courts have original jurisdiction over all civil actions where the matter in controversy exceeds $75,000 (exclusive of interest and costs) and is between citizens of different states. 28 U.S.C. 1332(a)(1). It has long been settled that the diversity statute requires complete diversity of citizenship. *Stiftung v. Plains Mkt., LP*, 603 F.3d 295, 297 (5th Cir. 2010) (citing *Whalen v. Carter*, 954 F.2d 1087 1094 (5th Cir. 1992); *Panalpina*

6

*Welttransport GmBH v. Geosource, Inc.*, 764 F.2d 352-354-55 (5ᵗʰ Cir. 1985)). In other words, a federal court cannot exercise diversity jurisdiction under § 1332(a)(1) if any plaintiff shares the same citizenship as any defendant, *id.*, or if one of the parities is not a "citizen" of a state, *see Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989).

The Petition presents two impediments to original jurisdiction based on diversity of citizenship. First, the parties are not completely diverse in citizenship because Plaquemines Parish is considered a citizen of the State of Louisiana, and some of the defendants are likewise Louisiana citizens. *Moor v. Alameda Cnty.*, 411 U.S. 693, 717-18 (1973) (confirming that a political subdivision of a state is a citizen of the state for diversity purposes). Second, Plaquemines Parish has sued both on its own behalf and on behalf of the State of Louisiana. But the State is not a "citizen" for purposes of diversity jurisdiction and § 1332(a)(1) requires that each party be a citizen of a state. *See id.*

Defendants argue that diversity jurisdiction is proper, however, because the Parish has egregiously misjoined the claims asserted in the Petition. Defendants suggest that the Court should sever the various claims so that diversity jurisdiction can be exercised over the claims against the non-diverse defendants (which constitute the greater part of the claims asserted) with the remainder of the claims being remanded to state court.

With regard to the presence of the State as a plaintiff destroying diversity jurisdiction, Defendants take the position that the Parish has no authority to assert claims either on behalf of Louisiana or in its own name as "agent" of the State. Therefore, according to Defendants, the State is not a "real party in interest" to any of the claims asserted and its purported presence in this action cannot affect diversity jurisdiction.

7

### a)      Misjoinder of Parties

Defendants' arguments pertaining to misjoinder implicate two inquiries: i) Does the doctrine of egregious misjoinder even apply in this circuit given that the Fifth Circuit has never *expressly* adopted the doctrine?; and ii) If egregious misjoinder applies in this circuit, then was the misjoinder in this case so "egregious" as to warrant severing the petition into many different lawsuits so that the Court can exercise jurisdiction over the claims against the removing Defendants?

### i)      Does the Doctrine of Egregious Misjoinder Apply in This Circuit?

Misjoinder is a form of fraudulent or improper joinder[7] that has its roots in a decision called *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on other grounds*, *Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000). In *Tapscott*, one group of plaintiffs had sued several defendants for damages arising out of service contacts on automobiles; another group of plaintiffs had sued several merchant defendants for claims arising out of service contracts on retail merchandise. The claims against the automobile defendants were wholly unrelated to the claims against the retail merchants, yet the automobile claims destroyed diversity jurisdiction over the entire action. The district court severed the merchant claims from the complaint in order to exercise diversity jurisdiction over them and remanded the remainder of the case. *Id.* at 1355. The plaintiffs

---

[7]   In *Smallwood v. Illinois Central Railroad Co.*, 385 F.3d 568, 571 n.1 (5th Cir. 2004), a majority of the Fifth Circuit sitting en banc formally adopted the term "improper joinder" in place of the long-used term "fraudulent joinder," finding no substantive difference in the two terms. Interestingly, in *Crockett v. R.J. Reynolds Tobacco Co.*, 436 F.3d 529 (5th Cir. 2006), the panel not only reverted to using the term "fraudulent joinder" in its traditional sense but also noted a distinction between"improper" joinder and "fraudulent" joinder. *See id.* at 533.

appealed.

The Eleventh Circuit affirmed the district court's procedure of severing the unrelated, diversity-destroying claims and remanding those to state court while retaining the claims between the diverse parties. *Tapscott*, 77 F.3d at 1360. The court explained that misjoinder of an in state defendant with no real connection to the controversy at issue can be just as improper as joining a defendant against whom the plaintiff has no cause of action per the fraudulent joinder doctrine. *Id.* at 1360 (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)). The appellate court was convinced that the misjoinder of claims in that case was particularly *egregious* so as to justify the district's court's action.

Importantly, however, the Eleventh Circuit stressed that it was not sanctioning the removal of every case that suffered from improperly joined claims. In other words, the "mere misjoinder" of claims does not *ipso facto* rise to the level of a fraudulent joinder. *Id.* Rather, the misjoinder in any given case must be "so egregious as to constitute fraudulent joinder." *Id.*

As noted above, the Fifth Circuit has not *expressly* adopted the *Tapscott* misjoinder doctrine as a type of fraudulent joinder.[8] But the Fifth Circuit has alluded to the doctrine favorably.[9] Accordingly, most judges in this district have concluded that the doctrine is likely

---

[8]  In fact, a simple electronic search of both reported and unreported Fifth Circuit decisions shows that the Fifth Circuit has consistently and steadfastly reiterated that there are *two* ways to establish fraudulent joinder (actual fraud in the pleading of jurisdictional facts or the inability of the plaintiff to establish a cause of action against the non-diverse party in state court), and the language used in those decisions does not allude to the possibility of a third type of fraudulent joinder such as egregious misjoinder.

[9] *Crockett v. R.J. Reynolds Tobacco Co.*, 436 F.3d 529, 533 (5th Cir. 2006) (recognizing that joinder may be improper without constituting fraudulent joinder); *In re Benjamin Moore & Co.*, 318 F.3d 626, 630-31 (5th Cir. 2002) (referring to *Tapscott* approvingly without actually

valid in this circuit even if not applicable in their particular cases, and some judges in this district, including this Court, have applied the doctrine in order to exercise diversity jurisdiction.[10]

For purposes of the instant motion to remand, the Court will assume that egregious misjoinder per *Tapscott* is a potential basis for Defendants to remove. The more difficult questions are whether the claims in this action are in fact misjoined, and if so, whether the misjoinder is sufficiently egregious in nature.

### ii)    Have Defendants Established Egregious Misjoinder?

The first step in the egregious misjoinder analysis is whether the claims are in fact misjoined under the applicable state law joinder rules.[11] The Louisiana Code of Civil

---

applying it); *In re Benjamin Moore & Co.*, 309 F.3d 296, 298 (5th Cir. 2002) (suggesting that the district court should have considered the defendants' arguments under *Tapscott*).

[10] *See, e.g., Bowman v. Horace Mann Ins. Co.*, No. 07-7056 2008 WL 282760 (E.D. La. Jan. 30, 2008) (Zainey, J.); *Global Oil Tools, Inc. v. Barnhill*, No. 12-1507, 2013 WL 3070840 (E.D. La. June 17, 2013 ) (Barbier, J.); *Milliet v. Liberty Mut. Ins. Co.*, No. 07-7443, 2008 WL 147821 (E.D. La. Jan. 11, 2008) (Engelhardt, J.); *Accardo v. Lafayette Ins. Co.*, No. 06-8568, 2007 WL 325368 (E.D. La. Jan. 30, 2007) (Vance, C.J.); *Berthelot v. Boh Bros. Const. Co.*, No. 05-4182, 2006 WL 1984661 (E.D. La. June 1, 2006) (Duval, J.).

The Parish directs the Court's attention to *Creadeur v. Atlantic Richfield Co.*, No. 14-695, 2014 WL 2999261 (W.D. La. July 3, 2014) (Hanna, M.J.), a decision in which the presiding magistrate judge refused to apply *Tapscott*. (Rec. Doc. 69 at 5). In that decision Magistrate Judge Hanna makes some extremely sound legal arguments that militate against the validity of the removal/sever/remand procedure employed in *Tapscott*. The Court takes judicial notice that after the briefing was completed in this case, the presiding district judge adopted the magistrate judge's recommendation and remanded the case to state court. (6:14-CV-695; Rec. Docs. 48 & 51) (Doherty, J.).

[11] The decision whether state or federal joinder rules should apply is often considered a predicate to the joinder determination. *See, e.g., Accardo*, 2007 WL 325368, at *3. Most district courts conclude that state joinder rules supply the appropriate standard because a removed case is originally filed in a state court. For cases removed from Louisiana courts, it has been noted that the same result obtains whether the federal or state rules are used. *See Defourneaux v. Metropolitan Prop. & Cas. Ins. .Co.*, No. 06-3809, 2006 WL 2524165, at *1 n.2 (E.D. La. Aug. 30, 2006) (Feldman, J.) (noting that the Rule 20 standards for joinder are very similar to the

Procedure defines the cumulation of actions as "the joinder of separate actions in the same judicial demand, whether by a single plaintiff against a single defendant, or by one or more plaintiffs against one or more defendants." La. Code. Civ. Pro. art. 461. Article 463 governs cumulation involving multiple plaintiffs and defendants, and the article provides in relevant part that "[t]wo or more parties may be joined in the same suit, either as plaintiffs or as defendants if—[t]here is a *community of interest* between the parties joined." La. Code Civ. Pro. art. 463(1) (emphasis added). The test in determining whether a community of interest is present is whether the cumulated causes of action arise out of the same facts or whether they present the same factual or legal issues. *Dietz v. Superior Oil Co.*, 129 So. 3d 836, 842 (La. App. 3d Cir. 2014) (quoting *Albarado v. Union Pac. R.R. Co.*, 787 So. 2d 431, 438 (La. App. 4th Cir. 2001)). A community of interest is present between different actions or parties, where enough factual overlap is present between the cases to make it commonsensical to litigate them together. *Id.* The community of interest standard for cumulation of actions under article 463 is a "liberal" one and it encompasses not only the parties' causes of action but also their defenses. *See Stevens v. Bd. of Trustees of Police Pens. Fund*, 309 So. 2d 144, 147 (La. 1975) (citing La. Code Civ. Pro. art 463 cmt. (c); *Gill v. City of Lake Charles*, 43 So. 879 (1907)). It reflects a policy to avoid where possible a multiplicity of actions in the interests of judicial efficiency, providing that it can be done without unfairness to the parties affected. *Id.*

---

Louisiana standards resulting in no material difference in the Court's application of the joinder rules).

     Because the parties used the state law joinder standards in their briefing to this Court, and because this action originated in state court, the Court will apply the Louisiana state law joinder standards. But application of the federal standard under Rule 20 would not lead to a different outcome.

The removing Defendants contend that the claims against the 19 defendants in this action are tangentially related at best but clearly lack a community of interest. Defendants point out that the claims in this lawsuit are based on 1018 different state permits, each of which was issued to or applied for by a specific entity, for violations that are discrete acts. According to Defendants, the claims challenge activities that differ by defendant, time frame, locale, and procedure and there is no allegation of joint liability or conspiracy.

In support of these contentions Defendants offer the expert testimony of Larry L. Lovas. (Rec. Doc. 46-3, Exhibit 3). Lovas is an environmental engineer. Lovas used a computer system to analyze information regarding each of the permits being sued upon in this case. Lovas determined that the Operational Area covers approximately 207 square miles, and that the permits span the course of over three decades and cover a wide range of activities—activities that he characterized as unrelated. (*Id.* ¶¶ 14, 17, 19, 21). By way of example, Lovas selected two permits issued in favor of diverse defendants and juxtaposed the characteristics of those permits against two permits issued to one of the non-diverse defendants. (*Id.* ¶¶ 18, 19, 20).

Defendants emphasize that the particular procedures, methods, equipment, etc. employed by each defendant as well as the governing regulations and standards will vary by activity, defendant, and time period. Likewise, the amount, type and specific cause of the damage will differ from defendant to defendant. Moreover, liability will turn exclusively on the language of each permit making each claim unique.[12]

---

[12] Defendants recite back to the Court a portion of its prior order (Rec. Doc. 28) pertaining to transfer of collateral proceedings under Local Rule 3.1. (Rec. Doc. 46 at 1). That order of course dealt with relatedness between the 28 different CZM lawsuits now pending in this district. Therefore, if the Parish's cumulation algorithm by field is practicable, then the prior

The Parish, on the other hand, contends that claims against all defendants are based on identical causes of action and legal theories, and the factual overlap is sufficient to make it commonsensical to litigate the claims in one action. The Parish explains that what is at issue in this case is the *cumulative* effect of Defendants' historical oil and gas operations, and those cumulative impacts must be considered when trying to fashion a restoration remedy. The Parish points out that § 49:214.36(E) requires that the remedy for violations be one that is feasible and practical but severing the action into individual permit actions would render any restoration remedy impracticable because of the piecemeal nature of the litigation. The Parish emphasizes that meaningful coastal restoration cannot take place by litigating the various permit claims on a one-by-one basis.

The Parish explains that the joinder decision in this case was based on oil and gas field designations as those are defined by the Louisiana Department of Natural Resources ("LDNR"). A field is normally defined by the common petroleum reservoir involved. There may be many operators in a single field operating under different permits. The Parish points out that the fields involved in this case (Coquille Bay, Delta Duck Club, Grand Bay, Main Pass Block 47, Main Pass Block 69, Raphael Pass, and Romere Pass) overlap geographically which leads to further cumulation because of the way that subsurface reservoirs are situated. Thus, the first-order cumulation is based on the fields themselves, and the second-order cumulation is based on the significant geographic overlap of those fields.

The Parish contends that this field cumulation scheme, which resulted in the Operation Area for this action, makes sense from a joinder perspective because the various

---

order, which did not deal with the validity of the specific joinder decision made in any one of the individual actions, is not particularly enlightening.

drilling and production operators in a field are typically covered by the same field-wide orders from LDNR. Further, when a new field proves promising, the tendency is for a core group of operators to alight upon the area, typically using the same type of technology and methods, subject to the same industry and regulatory standards. Moreover, oil and gas production within a common field is typically supported by common or shared infrastructure and processing facilities especially fields located in isolated marshes like the fields in this case. Also, close proximity of operations in a field means that often the same type of pollution occurs and is subjected to similar tidal/geology and habitat factors. The Parish has submitted the affidavits from three experts in support of its contentions regarding the scientific support for its joinder decision: Sherwood M. Gagliano, Ph.D., Paul H. Templet, Ph.D., Charles R. Norman (Rec. Doc. 55, Exhibits B, C, & E).

The Parish argues that the commonalities identified above make for numerous common issues of science and fact that cut across the various claims so these are not wholly unrelated claims and the joinder is reasonable and simply makes sense. The Parish points out that Defendants' approach would require that this case be broken up into hundreds if not thousands of individual actions which would make no sense in light of the holistic restoration remedy being sought. And litigating on a case-by-case basis would be cost prohibitive for both the Parish and Defendants.

The Court begins by noting that there is no inherent conflict in the expert evidence submitted by either side as to the joinder issue. The Parish's experts explain how the oil and gas industry and its regulatory bodies group reservoirs into fields, and why grouping at the field level creates commonalities amongst the production sites in a field. Defendants' expert explains the geographic characteristics of the Operational Area and the factors that create

14

significant differences among the permits being sued upon. Ignoring any commentary as to the relatedness of the individual claims—which is a legal opinion that no expert in this case is qualified to give—all of the experts' opinions are useful in a collective sense. But neither the commonalities amongst production sites in a field nor the distinct and differing nature of the individual permits at issue alone carries the day on the joinder issue.

The Court is not persuaded that the record at this juncture demonstrates that the claims asserted are so lacking in a community of interest as to be misjoined under Code of Civil Procedure article 463. While it is true that the claims are all based on the same body of law, and that permits issued in the same field may be subject to the same regulatory mandates depending on the time frame involved, the thread that ties these claims together is the injury being sued upon and the remedy sought. The remedy sought in this case is coastal restoration and remediation costs, a type of recovery that the CZM Laws specifically recognize. *See* La. R.S. § 49:214.36(E). But the type of coastal damage alleged in this case did not result from a single catastrophic incident attributable to one defendant or from a single defendant's conduct occurring in a discrete time period. Rather, the theory is one of cumulative and collective impact. Liability for any given defendant will necessarily be based on the consequences of the permit violations that the Parish can prove as to that specific defendant but the injury that the Parish seeks to redress in this action is one that all of the Defendants are alleged to have collectively caused over time. When the collective action of several defendants is alleged to have damaged the plaintiff's property a misjoinder does not occur simply because the plaintiff joins all of the allegedly accountable parties in a single action. *See Gill*, 43 So. at 900 (quoting with approval the result in *Woodruff v. N. Bloomfield Gravel Min. Co.*, (C.C.) 16 Fed. 25)). Louisiana law does not require allegations of conspiracy

15

or joint liability for a community of interest to exist amongst cumulated claims.

Defendants cite *Accardo* and *Dietz*, *supra*, and *Broussard v. Hilcorp Energy Co.*, 998 So. 2d 946, (La. App. 3d Cir. 2008), as decisions where cumulation of property damage claims was held to be improper, in support of their arguments in this case. But all of those decisions are distinguishable because none of them dealt with a common injury. *Accardo* involved an attempt by individual homeowners, each with their own separate property damages resulting from Hurricane Katrina, to join their individual claims against various insurers in a single action. The *Accardo* claims involved no common injury. 2007 WL 325368. Likewise, *Dietz* and *Broussard* both involved an attempt to cumulate claims for damages to *non-contiguous* tracts of land, which again involved no common injury. *Dietz*, 129 So. 3d at 839; *Broussard*, 998 So. 2d at 953.

Proof of causation under the Parish's approach will surely be difficult. But whether the Parish can actually prove sufficient causation vis à vis any given defendant, and whether the restoration remedy that the Parish seeks will be "feasible and practical," as required by La. R.S. § 49:214.36(E), are merits-based questions that the Court cannot properly resolve as part of the jurisdictional analysis. *Am. Meth. Episcopal Church v. Lucien*, 756 F.3d 788, 796 (5th Cir. 2014) (reiterating that district courts must not become "entangled in the merits" at the jurisdictional stage). Thus, liability will be an individual determination, as is typical under Louisiana law, but the injury complained of ties the claims together in a community of interest amongst the individual permit claims that renders them not wholly unrelated.

In light of the alleged cumulative impact alleged and the relief sought, severing this single case into 1018 individual permit actions would be senseless. Defendants' suggestion to sever the case 19 ways in order to cumulate the claims as to each defendant makes sense

16

only from a jurisdictional standpoint, not from a practical standpoint.[13] That said, while the Parish offers plausible reasons for grouping the permit claims by oil and gas field, it is not altogether clear that this organizational scheme will prove practicable in the end if the claims must ultimately go to trial, and Defendants complain that it would be unfair to put all of the claims before the same jury. Once the litigation is fully underway, a more practicable scheme for grouping the claims for trial may very well emerge, and it will be within the sound discretion of the presiding judge to determine whether issues of jury confusion, prejudice, or judicial economy militate in favor of trying some of claims separately. But that

---

[13] Of course, severing the action by defendant into 19 different lawsuits not only cures the diversity problem for the removing Defendants but it also eases the burden that they would encounter as to the jurisdictional amount once the claims are severed. Throughout all of their briefing Defendants mentioned jurisdictional amount only once, stating that the Parish was not disputing that the amount in controversy requirement was met, and that in light of the type of relief sought, the amount in controversy would undoubtedly exceed $75,000.00. (Rec. Doc. 46 at 3 n.2). Of course, the Parish's acquiescence on the issue is of no legal significance, *Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999) (recognizing that the amount in controversy cannot be established by consent or waiver), and the Court agrees that as the action now stands, the common remedy that ties the claims together most likely supports aggregation of the jurisdictional amount for all of the claims. *Id.* But if Defendants were to obtain the severance that they seek for jurisdictional purposes based on the contention that the claims in this action are all unrelated to each other with no common remedy, they could no longer rely on the supplemental jurisdiction statute or the aggregation of jurisdictional amounts, and would have to establish that the jurisdictional amount is satisfied for each of the severed actions independently. *See* 28 U.S.C. § 1367 (a) ("[T]he district courts have supplemental jurisdiction over all other claims that are **so related to claims in the action within such original jurisdiction that they form part of the same case or controversy** under Article III . . . .") (emphasis added). But because it is generally recognized that the amounts in controversy for all claims against a single defendant can be aggregated even if the claims are unrelated, severing the case 19 ways by defendant would significantly ease each defendant's burden on this issue. *Aetna Cas. & Sur. Co. v. Graves*, 381 F. Supp. 1159, 1163 (D.C. La. 1974) (citing *Crawford v. Neal*, 144 U.S. 585 (1892); *Pearson v. Nat'l Soc. of Puc. Acct.*, 200 F.2d 897 (5th Cir. 1953)) (recognizing that a plaintiff can aggregate the jurisdictional amount on all claims joined against a single defendant). It the Court were to sever the claims in any other manner, then Defendants could very well face a promethean challenge regarding jurisdictional amount on a claim by claim basis. And even if the Court were to agree with Defendants' contention that the Parish's joinder decision is impracticable, it is not especially clear to the Court that severing the case 19 ways by defendant cures any of the issues that Defendants have identified with the current joinder.

possibility does not compel the conclusion that the claims are misjoined for pleading purposes.

But even if the claims are misjoined under article 463, the Court is not persuaded that the misjoinder would be egregious to the point of constituting a fraudulent joinder. The Parish's goal in this lawsuit is to hold Defendants accountable for their conduct to the extent that it damaged the coastal region in Plaquemines Parish. Perhaps one approach would have been to cumulate all of the permit claims for Plaquemines Parish into a single behemoth lawsuit in lieu of filing 28 separate actions. Instead of doing that the Parish divided the actions into Operational Areas grouped by oil fields and filed separate lawsuits. Maps of the Operational Area for this suit are located at Exhibits B and C to the Petition and present a clear graphic of the permits being sued upon. These maps do not suggest that the Parish gerrymandered the Operational Area in such a manner that now conveniently serves to defeat federal jurisdiction. Rather, the fields represented in this action appear to be contiguous and located within geographic proximity to each other.

In sum, Defendants have not established that the doctrine of egregious misjoinder renders the exercise of diversity jurisdiction appropriate in this case.

### b)    Does the State Destroy Diversity Jurisdiction?

The Court's ruling on the egregious misjoinder issue renders moot the question whether the claims on behalf of the State destroy diversity jurisdiction. For completeness, the Court nonetheless will address this potential impediment to diversity jurisdiction.

According to the Petition, the plaintiffs in this action are 1) the Parish of Plaquemines, and 2) the State of Louisiana *ex rel.* Parish of Plaquemines. (Rec. Doc. 1-1).

18

The law is well-settled in that a state is not a citizen for purposes of diversity jurisdiction so its joinder in an action will destroy diversity. *Melder v. Allstate Corp.*, 404 F.3d 328, 335 (5th Cir. 2005) (DeMoss, J., dissenting) (quoting *Tex. Dep't of Hous. & Cmty. Affairs v. Verex Assur., Inc.*, 68 F.3d 922, 926 (5th Cir. 1995)). But if the State is named as a mere nominal party with no real interest in a dispute then its presence in the action is ignored for jurisdictional purposes and it does not destroy diversity amongst the other parties. *See Louisiana v. Union Oil Co.*, 458 F.3d 364, 366 (5th Cir. 2006) (citing *Wolff v. Wolff*, 768 F.2d 642, 645 (5th Cir. 1985)). Even where the nominal party is an agent of the State instead of the State itself, diversity is destroyed because the agent is suing to enforce a right of the State. *Robertson v. Wolf River Lumber Co.*, 269 F. 606, 607 (5th Cir. 1921). In other words, in determining diversity jurisdiction, the citizenship of the real parties in interest is determinative. *Wolff*, 768 F.2d at 645 (citing *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980); *Nunn v. Feltinton*, 294 F.2d 450, 453 (5th Cir. 1961)). The real party in interest is the person holding the substantive right sought to be enforced and not necessarily the person who will ultimately benefit from the recovery. *Farrell Constr. Co. v. Jeff. Ph.*, 896 F.2d 136, 140 (5th Cir. 1990) (citing *United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir.1969)). Conversely, a party not possessing a right under substantive law is not the real party in interest with respect to that right and may not assert it. *Id.* A federal court sitting in diversity must look to state law to determine which party holds the substantive right. *Id.*

As previously explained, under the CZM Laws the State issues permits relating to "uses of state concern" in the Coastal Zone, and local governments with "approved programs" issue permits for "uses of local concern." In this action, Plaquemines Parish is suing for permit violations pertaining to both uses of local concern and uses of state concern

19

within Plaquemines Parish. Defendants do not and cannot deny that the State is the real party in interest with respect to any claim arising under the CZM Laws that pertains to a use of state concern, and the substantive rights at issue in any such claim are actually those of the State. Thus, unlike the Fifth Circuit's decision in *Louisiana v. Union Oil, supra*, the jurisdictional challenge in this case is not based on the contention that the State is merely a nominal party with no real interest in the suit. Rather, the jurisdictional dispute in this case turns on whether the CZM Laws' statutory scheme authorizes the Parish to assert claims belonging to the State.[14]

In Louisiana, the Attorney General is the chief legal officer of the State. La. Const. art. IV, § 8. As such, he has the authority to *inter alia* institute, prosecute, or intervene in any civil action or proceeding as necessary for the assertion or protection of any right or interest of the State. *Id.* In litigation involving tort or contract, the Attorney General shall represent the State and all departments and agencies of State government. La. R.S. § 49:257(A). Article IV, § 8 of the state constitution does not purport, however, to give *exclusive* authority to the Attorney General to institute civil proceedings to assert the substantive rights of the state or to represent its interests in litigation. Accordingly, under state law, the legislature can authorize non-state officers or entities to sue to protect the State's interests in specific situations. *See, e.g., Union Oil*, 458 F.3d at 367 (citing La. R.S. § 41:961—sixteenth section

---

[14] Because the substantive rights in this case belong to the State of Louisiana making it the real party in interest, at least insofar as state permits and state uses are concerned, the Court may lack jurisdiction to consider whether the Parish has authority under state law to bring this case on behalf of the State. *See State of La. v. Am. Bankers Ins. Co.*, No. 12-797 (Rec. Doc. 18; 8/21/2012) (Vance, J.) (remanding to state court); *see also Melder*, 404 F.3d at 333 (DeMoss, J., dissenting).

20

school lands);[15] *Williams v. Belle of Orleans, LLC*, 890 So. 2d 670 (La. App. 4th Cir. 2005) (citing La. R.S. § 47:1998(C)—judicial review of Tax Commission determinations).[16]

But Louisiana law does not brook self-appointed interlopers who institute legal action on behalf of the State without the legal authority to do so. *See, e.g., In re La. Riverboat Gaming Comm'n*, 659 So. 2d 775 (La. App. 1st Cir. 1995). In *Louisiana Riverboat Gaming Commission*, upon which Defendants rely heavily, the District Attorney for East Baton Rouge Parish filed a petition seeking to protect the interests of the State in pending litigation over the rule making authority of the Louisiana Riverboat Gaming Commission. The district attorney had concluded that the State's interests were not being protected in the litigation because the Commission's interests were contrary to the State's and the Attorney General was representing the Commission. The Commission challenged the district

---

[15]

The school boards of the various parishes of the state may contract with and employ on the part of the State of Louisiana, attorneys at law, to recover for the state, damages for trespass to the sixteenth section known as school lands the title to which is still in the state. Each of the boards may make these contracts for the lands situated in its own parish and no others. The school boards may also sue for and recover the sixteenth section known as school lands.

La. R.S. § 41:961.

[16]

The assessor shall bring suit, when necessary to protect the interest of the state, and shall also have the right of appeal and such proceedings shall be without cost to him or the state; however, prior to the initiation of a lawsuit against a taxpayer who is suspected of concealing property from assessment, the assessor shall provide written notice to the governing body of the taxing authority the tax revenues of which are the subject of the lawsuit.

La. R.S. § 47:1998(C).

attorney's legal authority to file suit on behalf of the State. The trial judge found in favor of the district attorney but the First Circuit granted the Commission's writ application and reversed. *La. Riverboat Gaming Comm'n*, 659 So. 2d at 776.

In reversing, the First Circuit Court of Appeal stepped through a thorough examination of the district attorney's authority under state law and juxtaposed it with the Attorney General's authority. *Id.* at 782-83. The appellate court could discern no delegation of authority in either the state constitution or in any statute that would allow the district attorney to *sua sponte* file a civil proceeding in the name of the State for the purpose of protecting the State's interests. *Id.*

*Louisiana Riverboat Gaming Commission* does not impugn the principle implicit in *Union Oil* and *Williams*—other governmental entities or officials do have the legal authority to represent the State when the legislature specifically grants them the authority to do so.[17] And unlike the district attorney in *Louisiana Riverboat Gaming Commission*, the Parish does purport to rely on a specific legislative grant of authority in § 49:214.36(D) of the CZM Laws to assert the State's rights. That statutory provision states:

> The secretary, the attorney general, an appropriate district attorney, **or a local government with an approved program** may bring such injunctive, declaratory, or other actions as are necessary to ensure that no uses are made of the coastal zone for which a coastal use permit has not been issued when required or which are not in accordance with the terms and conditions of a coastal use permit.

---

[17] Because the legislature can give standing to other entities beside the Attorney General to represent the State's interests, the Court does not find Attorney General Caldwell's letter to counsel for the Parish to be particularly useful to Defendants. (Rec. Doc. 76-1). The Court makes note of the Parish's counsel's observations regarding this letter, a copy of which Defendants were able to obtain before the addressee received it, but finds it unnecessary to address them. Further, the Attorney General has not elected to intervene in this cause, a course of conduct that in and of itself would most assuredly destroy diversity jurisdiction.

La. R.S. § 49:214.36(D) (emphasis added).

It is undisputed that the Parish is a local government with an approved Coastal Zone program. Relying on the fact that § 49:214.36(D) refers to "coastal use permit[s]," a term which is not modified by either "local" or "state," the Parish's contention is that the foregoing statute authorizes the Parish to take legal action for permit violations pertaining to uses of state concern, *i.e.*, state permits. The Parish interprets § 49:214.36(D) to mean that parishes with approved programs have equal standing with the Secretary,[18] Attorney General, and district attorneys to sue on behalf of the State regardless of whether the permit (or lack of one) at issue is a local use or state use permit.

Defendants argue that the Parish's interpretation of § 49:214.36(D) requires reading the words "on behalf of the State" into the statute. They point out that when the legislature intends to allow a party to sue on behalf of the State it uses express language to that effect, as was the case in *Union Oil* and *Williams, supra*. Therefore, according to Defendants, even if the Parish were correct that § 49:214.36(D) authorized it to bring suit in its own name for any violation whatsoever, it would not necessarily follow that parishes have the authority to file suit *on behalf of the State*. (Rec. Doc. 46, Defendants' Opposition at 14).

Defendants also contend that the Parish's interpretation of § 49:214.36(D) is contrary to the actual text of the statute because under Louisiana law the "or" must be read in the disjunctive, which means that the State and the Parish cannot file suit simultaneously, which is precisely what the Parish claims to be doing in this litigation. Defendants posit that taken to its extreme, under the Parish's interpretation of the statute any parish with an approved

---

[18] "Secretary" refers to the secretary of LDNR. La. R.S. 49:214.23(12).

local program could simply claim that it has the authority to file a lawsuit based on violations of another parish's permits, which Defendants contend would result in an absurd interpretation of the statute.

The Court is persuaded that § 49:214.36(D) can reasonably be interpreted as authorizing the Parish to file suit to enforce the CZM Laws as they pertain to uses of State concern, and therefore State-issued permits, within the confines of Plaquemines Parish. First, as the Parish points out, § 49:214.36(D) contains no limiting or qualifying language whatsoever when it refers to a "coastal use permit." The lack of limiting verbiage in this section of the statute is particularly telling in light of the other subparts of § 49:214.36, all of which have clear limiting language that the legislature omitted from § 49:214.36(D).[19] Defendants' position would require the Court to graft either the "uses under its jurisdiction" language from § 49:214.36(B) or the "use permits issued by it" language from § 49:214.36(C) into § 49:214.36(D). But given that the legislature took the time in the surrounding subparts of the same statute to be express when it intended to limit the role of local governments, one

---

[19]

Subpart (B) states:

The secretary, ***and each local government with an approved program as to uses under its jurisdiction***, shall have the authority to issue cease and desist orders against any person found to be in violation of this Subpart or the rules and regulations issued hereunder.

La. R.S. § 49:214.36(B) (emphasis added).

Subpart (C) states:

The secretary, ***and each local government with an approved program as to coastal use permits issued by it***, shall have the authority to suspend, revoke, or modify coastal use permits if the user is found to have violated any of the conditions of the coastal use permit.

La. R.S. § 49:214.36(C) (emphasis added).

would reasonably conclude that the legislature made a deliberate decision to omit that language from § 49:214.36(D).

Second, it strikes the Court as neither absurd nor contrary to the overarching structure and regulatory scheme of the CZM Laws to allow a parish with its own approved coastal management program to file suit on uses of state concern within its own geographic jurisdiction. Louisiana envisioned a shared state-local partnership approach for the management of Louisiana's coastal zone. (Rec. Doc. 55-1, Reply Exhibit A). The CZM Laws' recognition of approved local programs and uses of local concern that local governments can manage themselves is consistent with this approach. *See* La. R.S. § 49:214.22(5) & (7).[20] Via the CZM Laws' creation of a category of local uses and recognition of approved local programs, the State was clearly trying to include local governments in the management of the coastal lands within their jurisdictions. It is not a stretch to assume that local governments in coastal parishes that take the time to obtain approved programs of their own and issue their own permits will develop a level of expertise in the area of coastal zone management, including having in place a procedure for the enforcement of permits. The

---

[20]

Subpart (5) states:

> To develop and implement a coastal resources management program which is based on consideration of our resources, the environment, the needs of the people of the state, the nation, and of state and local government.

La. R.S. § 49:214.22(5)

Subpart (7) states:

> To develop and implement a coastal resources management program which is based on consideration of our resources, the environment, the needs of the people of the state, the nation, and of state and local government.

La. R.S. § 49:214.22(7).

legislature might very well have concluded that the State's resources would be most efficiently used by allowing such parishes to bring enforcement actions against State-use violators in their own jurisdictions, when none of the State's authorized officers have elected to do so. After all, venue for all suits brought under the CZM Laws is expressly placed in the parish where the activities or violations occurred. *See* La. R.S. § 49:214.36(G). Defendants' characterization of the CZM Laws as a scheme designed to hold local governments to the narrowest possible role in the area of coastal zone management is an unpersuasive one.

Finally, the Court is persuaded that the legislature's recent addition of a new Subpart (O) to § 49:214.36 confirms that the legislature was not remiss when it omitted any limiting language from § 49:214.36(D). Paragraph (2) of the newly enacted Subpart (O) provides:

> Any monies received by any state ***or local governmental entity arising from or related to a state or federal permit*** issued pursuant to [the CZM Laws or federal law], a violation thereof, or enforcement thereof, or for damages or other relief arising from or related to any of the foregoing . . . shall be used for integrated coastal protection, including coastal restoration, hurricane protection, and improving the resiliency of the coastal area.

2014 La. Acts 544, § 1 (approved June 6, 2014) (emphasis added). The provisions of the Act apply to all actions pending on the effective date of the Act. *Id.* § 2.

This provision mandates by law what a local government can do with monies that it recovers for violations of *state* permits. The Act states that it applies to pending actions and according to Defendants, its legislative history indicates that it does not enlarge a local government's rights under the CZM Laws. (Rec. Doc. 68, Defendants' Post-Hearing Brief at 6 n.13). Given that this statute directs how a local government must use recoveries on state permits, and given that it is not creating any new rights, the statute can only have meaning if local governments could already sue state permit violators under § 49:214.36(D).

26

Defendants suggest that the Louisiana Administrative Code at title 43, pt. I., § 723(D)(4), pertaining to the enforcement of coastal use permits, supports their interpretation of § 49:214.36(D). That section dictates the administrative procedure to be followed when a permitee fails to comply with a cease and desist order or the suspension or revocation of a permit, and directs *the permitting body* to seek appropriate judicial relief under § 49:214.36 of the CZM Laws. In that same vein, Defendants point out that La. R.S. § 49:214.36(L) requires the State to pursue "less drastic remedies" before seeking penalties, yet to accept the Parish's position one would have to conclude the Parish not only has the same authority as the State but operates under even less restrictions. (Rec. Doc. 68, Defendants' Post-Hearing Brief at 4-5 nn.9 & 10).

This argument is unpersuasive because the Administrative Code merely reflects the clear distinction that the legislature created in the CZM Laws between cease and desist orders and enforcement actions. Section 49:214.36(B) expressly limits a local government's authority to issue cease and desist orders to permits pertaining to local uses. See note 17, *supra*. As the Court has already pointed out, for whatever reason the legislature chose not to place such a limit on enforcement actions. Further, the Parish's damage claims are not limited to permitted uses to which § 723(D)(4) of the Administrative Code pertains. (Rec. Doc. 69, the Parish's Post-Hearing Brief at 4). And the "less drastic remedies" that Defendants refer to in § 49:214.36(L) pertain to the assessment of administrative costs and penalties under § 49:214.36(H), which are available "[i]n addition to the other enforcement actions authorized by [§ 214.36]." None of these provisions suggest that § 49:214.36(D) should be interpreted contrary to its own non-limiting text.

For all of the foregoing reasons, the Court is persuaded that § 49:214.36(D) provides

the necessary statutory authorization for the Parish to institute civil proceedings to protect the interests of the State, *i.e.*, to sue for violations of the CZM Laws that occur in Plaquemines Parish arising out of State uses and/or State-issued permits. This is not an absurd result even if allowing a parish to sue for violations of another parish's permits would be, which is not what the Parish is doing in this suit. Section 49:214.36(D) does lack the more express "state" language found in the statutes at issue in *Louisiana Union Oil* and *Williams, supra*, much less an *explicit* authorization for a parish to join the State of Louisiana as an active party-plaintiff in civil litigation.[21] But the Court need not grapple with the question of whether Louisiana law requires an express grant of authority for a local government to join the State as a party plaintiff, as the Parish has done in this case. When the Parish sues on issues of State concern, it does sue *on behalf of the State* regardless of whether the State is actually a named party to the litigation because the suit is to enforce the State's substantive rights. In such a situation the State is the real party in interest. Under federal law even if the State is not actually joined as a named party, diversity jurisdiction is destroyed when an agent of the State sues to enforce the State's substantive rights making the State the real party in interest. *See Robertson*, 269 F. at 607.

Although the Court is persuaded that the Parish's interpretation of § 49:214.36(D) is the correct one, at a minimum the provision is ambiguous as to whether a local government with an approved program can file suit on uses of State concern and/or State-issued permits. Under the clear law of this circuit, in the context of a jurisdictional inquiry, this ambiguity must be interpreted in the Parish's favor. *African Method. Episcopal Church v. Annual Conf. of the African Method. Episc. Church*, 756 F.3d 788, 793 (5th Cir. 2014) ("We repeat for

---

[21] See notes 15 & 16, *supra*.

emphasis that 'any . . . ambiguities of state law must be resolved' in favor of remand.").

In sum, Defendants have not established that the State's presence in this lawsuit can be ignored for purposes of diversity jurisdiction.

### 2)      Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act or OCSLA contains its own independent grant of original jurisdiction:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.

43 U.S.C. § 1349(b)(1).

Courts in this circuit typically assess jurisdiction under this provision by applying a two-prong inquiry which asks 1) whether the activities that caused the injury constituted an "operation" "conducted on the outer continental shelf" that involved the exploration and production of minerals, and 2) whether the case "arises out of or in connection with" that operation. *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (citing *EP Operating Ltd. Partner. v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994)). The statute does not define the term "operation." But in this circuit, "operation" for purposes of OCSLA jurisdiction is defined as "the doing of some physical act." *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996) (quoting *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1207 (5th Cir. 1988)). The term "operation" is broadly construed because it is used in conjunction with the terms "exploration," development," and "production," all of which are broadly defined in OCSLA, and encompass the full range of oil and gas activity. *EP*

29

*Operating*, 26 F.3d at 568 & n.12 (citing 43 U.S.C. § 1331(k)-(m)).

Once it has been established that the first prong of the inquiry is met, *i.e.*, that the activities that caused the injury constituted an operation on the OCS, courts in this circuit then apply a "but for" test to resolve the causation aspect of the second prong, *i.e.*, whether the dispute "arises out of, or in connection with" the OCS operation. *Tenn. Gas*, 87 F.3d at 155 (citing *Recar v. CNG Prod. Co.*, 853 F.2d 367, 369 (5th Cir. 1988)). The test asks whether the injury would have occurred in the absence of the OCS operation identified in the first prong. *See id.* The Fifth Circuit has interpreted § 1349(b)(1) as straightforward and broad. *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (citing *Tenn. Gas*, 87 F.3d at 154; *EP Operating Ltd. Partner. v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994)). A plaintiff need not expressly invoke OCSLA for it to apply. [22] *Id.* (quoting *Barker*, 713 F.3d at 213.

In this case all of the oil and gas activities that give rise to the claims asserted in this action occurred in Plaquemines Parish—none of the operations that gave rise to the alleged violations of the CZM Laws occurred on the Outer Continental Shelf ("OCS"). Moreover, all of the resulting injury and damage was sustained in Plaquemines Parish, not on the OCS. Defendants argue that OCSLA nonetheless vests this Court with original subject matter jurisdiction because OCSLA's jurisdictional grant does not contain a situs requirement, and the complained-of activities need not have occurred on the OCS in order for jurisdiction to attach. Defendants asseverate that in recognition of this principle the Fifth Circuit has

---

[22] In the Petition, the Parish tried to specifically disavow jurisdiction under OSCLA. (Petition at 17 ¶ 33(p)). But a plaintiff need not expressly invoke OCSLA in order for it to apply so it is not governed by the well-pleaded complaint rule. *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1988)). Moreover, claims subject to OCSLA jurisdiction are removable without regard to the substantive law to be applied. *See id.* at 220-21.

upheld OCSLA jurisdiction where the dispute did not involve any physical acts on the OCS. (Rec. Doc. 46, Defendants' Opposition at 32 n.40).

With the jurisdictional inquiry unfettered by a "situs" requirement, Defendants contend that this action "involves" operations on the OCS, and it therefore arises in connection with OCS operations. Defendants support this contention by pointing out that some of the complained-of activity in this action pertains to pipelines that carry oil and gas from the OCS to the Operational Area, and that some of the facilities at issue in the Operational Area service oil and gas development on the OCS and co-mingle production with offshore sources. Defendants also assert that this dispute affects the efficient exploitation of minerals from the OCS, and presents a direct threat to federal interests because the sweeping relief sought in the Petition suggests that the Parish is seeking to remove Defendants' extensive infrastructure supporting oil and gas operations in the Operational Area. Defendants point out that if this occurs it will have a significant adverse impact on oil and gas production on the OCS because the OCS and onshore oil and gas systems do not operate independently but rather extensively overlap and share infrastructure. Finally, Defendants assert that the injuries alleged in this case would not have occurred "but for" OCS operations, thereby satisfying the Fifth Circuit's "but for" test for OCSLA jurisdiction.

In opposition, the Parish contends that OCSLA jurisdiction does not attach unless the "operation," *i.e.*, activity that causes the injury, occurs on the OCS. According to the Parish, a case or controversy that "arises out of, or in connection with" a non-OCS operation is not within the grant of § 1349(b)(1) jurisdiction. The Parish argues that Defendants' contention that indirect connectivity to operations on the OCS or infrastructure sharing between the

31

complained-of activities and activities occurring on the OCS is insufficient to trigger OCSLA, and would expand OCSLA jurisdiction to virtually any issue involving the oil and gas industry. The Parish points out that Defendants can cite no case holding that jurisdiction under § 1349(b)(1) was proper where both the complained-of activity and the resulting damage occurred wholly outside the OCS.

The Court is persuaded that the instant case fails under first prong of the Fifth Circuit's OCSLA jurisdiction analysis, *i.e.*, whether the activities that caused the injury constituted an operation conducted on the OCS. The activities or operations that the Parish alleges to have caused its injury all occurred in state waters where Defendants' activities were subject to Louisiana's permitting scheme. None of the activities, including those that involved pipelines that ultimately stretch to the OCS, took place on the OCS. Whether or not one characterizes this requirement as one of "situs," is immaterial. It remains that §1349 expressly tethers OCSLA jurisdiction to an operation on the OCS, and no Fifth Circuit case *that involved damage resulting from injurious physical acts* has eliminated that requirement.

To the extent that Defendants rely on *In re Deepwater Horizon* as having somehow eliminated the need to tie jurisdiction to an operation on the OCS they are overreaching. The plaintiffs in *Deepwater Horizon* were several Louisiana coastal parishes that had sued various oil and gas operators for penalties under the Louisiana wildlife protection statutes. The plaintiffs sustained damages when the Macondo well exploded in the Gulf of Mexico in April 2010. *Deepwater Horizon*, 745 F.3d at 161. The Macondo well was located on the OCS but the contaminants that caused the plaintiffs' damages had migrated inland to the coast. On appeal the plaintiffs raised several challenges to the district court's ruling that OCSLA

provided subject matter jurisdiction. In particular, the plaintiffs argued that § 1349(b)(1) contains a situs requirement that would not be satisfied in their case because the damages sustained were in state territorial waters, not on the OCS. *Id.* at 164. According to the plaintiffs, OCSLA jurisdiction required that the situs of the injurious activity *and the damages sustained* take place on the OCS. The plaintiffs maintained that their wildlife claims arose in the waters and on the shores of Louisiana, not on the OCS.

The Fifth Circuit rejected the plaintiffs' "situs" argument as flawed and explained that the plaintiffs were erroneously intertwining the OCSLA jurisdictional inquiry under § 1349(b)(1) with OCSLA's choice of law provision under 43 U.S.C. § 1333. *Deepwater Horizon*, 745 F.3d at 164. The court stated that § 1349's "arising out of, or in connection with" language precludes the imposition of an "artificial limit based on situs," and that to impose such a limit would conflict with the Fifth Circuit's "but for" test. *Id.* at 164. In that case, the contaminants that damaged the plaintiffs would not have entered state waters "but for" the catastrophic well explosion, which occurred on the OCS. *Id.* at 163-64.

*Deepwater Horizon* was a straightforward application of both § 1349(b)(1) and the Fifth Circuit's "but for" test because the case involved damages that were directly traceable to and proximately caused by an operation on the OCS. The result was not surprising, and the panel specifically commented that the OCSLA jurisdictional inquiry did not present a "challenging case." *Id.* at 164. The decision did not change the law in this circuit in any manner but it did clarify that § 1349(b)(1) jurisdiction is not destroyed simply because the situs of the injury is off of the OCS.[23] In other words, § 1349(b)(1) contains no "situs"

---

[23] While *Deepwater Horizon* did not effect any change in the law of this circuit the panel did explain the plaintiffs' folly in relying upon *Golden v. Omni Energy Services Corp.*, 242 Fed.

requirement *insofar as the injury or manifestation of damages is concerned*. When interpreting the panel's statement regarding situs, it is important to remain mindful that the jurisdictional issue in *Deepwater Horizon* was the proper application of the "but for" test—the first prong of the Fifth Circuit's jurisdictional test was not contested because the case unequivocally involved an injury-causing operation on the OCS. Thus, the decision did nothing to cast doubt on § 1349(b)(1)'s express requirement of an "operation conducted on the Outer Continental Shelf," which some may call a "situs" requirement. *See Amoco Prod.*, 844 F.2d at 1207 (referring to the "situs" of the operation on the OCS as an express requirement of § 1349 jurisdiction). *Deepwater Horizon* does not stand for the proposition that OCSLA jurisdiction is proper when neither the complained-of activities nor the damages occur on the OCS, and to the extent that Defendants seize upon the panel's no "artificial limit based on situs" statement to argue that proposition, they are stretching *Deepwater Horizon* well beyond its straightforward facts and holding.

Recognizing that the non-OCS situs of the injurious acts in this case precludes satisfaction of the first prong of the Fifth Circuit's test, Defendants urge the Court to employ the reasoning used in Fifth Circuit cases such as *EP Operating*, *supra*, *United Offshore Co. v. Southern Deepwater Pipeline Co.*, 899 F.2d 405 (5th Cir. 1990), and *Amoco Production*, *supra*—decisions that Defendants contend demonstrate that OCSLA jurisdiction is appropriate even when no physical acts occur on the OCS. Relying on these cases, Defendants argue that jurisdiction is proper because this action "involves" operations on the OCS, and it therefore arises in connection with OCS operations. In support of this argument,

---

Appx. 965 (5th Cir. 2007) (unpublished), a decision that had been difficult to reconcile with other Fifth Circuit precedent. *Deepwater Horizon,* 745 F.3d at 164 & n.5.

Defendants submit the affidavit of Benjamin Schlesinger, Ph.D. (Rec. Doc. 46-7, Defendants' Opposition Exhibit 7).

Schlesinger is an energy consultant for the natural gas and energy industries. Schlesinger explains why the OCS and onshore oil and gas systems in Louisiana do not operate independently, and how interfering with or removing certain aspects of the onshore infrastructure will risk disrupting OCS operations and possibly the delivery of federal royalties. (*Id.* at ¶¶ 12, 12a, 19). Schlesinger concludes that any interruption of or removal of permitted facilities would place OCS operations at substantial risk by disrupting or preventing transportation of OCS products to market. (*Id.* ¶ 23).

Schlesinger also prepared a visual depiction of how some of the permits in this action involve pipelines that pass through the Operational Area to carry oil and gas from the OCS. One oil pipeline in particular (P20030786) originates on the OCS and services production on the OCS. (*Id.* ¶ 15; Exhibits C & E).

Defendants correctly characterize *EP Operating*, *United Offshore Co.*, and *Amoco Production* as upholding OCSLA jurisdiction in the absence of physical acts on the OCS. But the critical distinction between those cases and cases like this one is that the causes of action in those cases did not arise out of any type of physical act whatsoever, much less an injurious one. *EP Operating* was a property partition action, *United Offshore* was a suit to enjoin arbitration proceedings, and *Amoco Production* was a contract dispute. Each of those commercial litigation cases involved equipment and production located on the OCS and the cause of action directly pertained to that equipment and/or production. *EP Operating*, 26 F.3d at 569 (millions of dollars worth of offshore equipment attached to the seabed of the OCS); *United Offshore,* 899 F.2d at 406 (an OCS pipeline transporting natural gas produced

35

on the OCS); *Amoco Production*, 844 F.2d at 1207 (take or pay contracts specifically pertaining to offshore production). The Fifth Circuit's challenge in those specific cases was to adhere to § 1349's requirement of an "operation" on the OCS in cases where the nature of the cause of action involved no physical act giving rise to the claim. Thus, while these cases clearly support the proposition that OCSLA jurisdiction does not require a substantive cause of action that arises out of a physical act on the shelf, it does not follow that OCSLA jurisdiction attaches in a case where the cause of action is based on injurious physical acts and those injurious acts occur in state waters. In other words, Defendants are urging the Court to eschew the usual two-prong test that applies when the case involves injurious physical acts in favor of a test that the Fifth Circuit has never held applicable in an injury case, property or otherwise. Defendants cite no controlling case where OCSLA jurisdiction was exercised in such a setting.[24]

Relying on the reasoning employed in *Amoco Production, supra*,[25] Defendants argue

---

[24] Defendants point to *Gautier v. Plains Pipeline*, LP, No. 12-1064, 2012 WL 3126848 (E.D. La. July 25, 2012) (Fallon, J.), as an example of a case where the district judge exercised OCSLA jurisdiction for damages to oyster beds in state waters, for tortious conduct that also occurred in state waters. Two issues are immediately apparent from the cited ruling. First, no party challenged OCSLA jurisdiction. Second, the ruling contains the following statement: "[T]his case involves injuries resulting from OCS operations." *Id.* 2012 WL 3126848, at *2. This Court will defer to the presiding judge's characterization of the case without questioning whether the statement was a correct one under the facts of the case.

Defendants also direct the Court's attention to *Ronquille v. Aminoil Inc.*, No. 14-164, 2014 WL 4387337 (E.D. La. Sept. 4, 2014) (Engelhardt, J.), a toxic exposure case where the plaintiff worked onshore but in a capacity that directly supported OCS operations. The district judge found a sufficient connection between the plaintiff's physical injury and the OCS operations that he had worked to support. Because of that connection, the Fifth Circuit's "but for" test was satisfied even though the injury-causing activity and the injury itself occurred off the OCS.

[25] In *Amoco Production v. Sea Robin Pipeline,* the Fifth Circuit concluded that OCSLA conferred jurisdiction over a take or pay contract dispute. The dispute pertained to offshore production and the appellate court was persuaded that Sea Robin's actions pursuant to that

that OCSLA jurisdiction is proper in this case because this action presents a direct threat to
the efficient exploitation of minerals on the OCS. Defendants contend that fairly read, the
Petition seeks to remove Defendants' extensive infrastructure of facilities that, while located
off the shelf, directly support operation on the OCS. Defendants point out that OCS and
onshore operations do not operate independently, but rather extensively overlap and
interconnect, share infrastructure between them and support offshore operations.
Defendants contend that to interfere with pieces of that infrastructure along the coast would
disrupt or negatively impact production on the OCS. Again, Defendants offer Dr.
Schlesinger's affidavit in support of these contentions. (Rec. Doc. 46-7, Defendants'
Opposition Exhibit 7).

It does not strain credulity to suggest that the dismantling of certain of Defendants'
Plaquemines Parish facilities could affect OCS operations. Of course in order for that to
occur, many uncertain events would have to come to fruition, the least of which would be a
victory for the Parish on its claims and an injunction in its favor, even though the Parish
denies that it is seeking injunctive relief. Petition ¶ 33(w) & 34. The problem with
Defendants' argument from a jurisdictional standpoint is that they seek to hinge federal
jurisdiction on uncertain, speculative, and completely hypothetical future events. Federal
courts have no jurisdiction over claims that rest upon "contingent future events that may not
occur as anticipated, or indeed may not occur at all." *Camsoft Data Sys. v. So. Elec. Supp.,*

---

contract had a direct effect on offshore production. 844 F.2d at 1210. In construing the term
"operation" under § 1349 broadly enough to encompass a contract action, the Fifth Circuit
reasoned that the "efficient exploitation" of the federally-owned minerals on the OCS was a
primary reason behind OCSLA. *Id.* Therefore, any dispute that alters the progress of production
activities on the OCS threatens to impair the recovery of federally-owned minerals and was
intended by Congress to fall within § 1349's jurisdiction. *Id.*

*Inc.*, 756 F.3d 327, 336 (5th Cir. 2014). In contrast, in *Amoco Production*, *supra*, the decision upon which Defendants rely for their "efficient exploitation" argument, the panel was persuaded that the parties' adherence to or abandonment of the contracts at issue would have a direct effect on offshore production. 844 F.2d at 1210.

To the extent that Defendants rely on the interconnectedness and interdependence of OCS operations with the oil and gas infrastructure located in Plaquemines Parish in order to create a jurisdictional hook, the Court agrees with the two decisions in this district that have already rejected this theory as a basis for exercising OCSLA jurisdiction over injuries sustained in state waters from activities that occurred off the shelf. *Ellender Heirs, LLC v. Exxon Mobil Corp.*, No. 14-711, 2014 WL 4231186 (E.D. La. Aug. 26, 2014) (Fallon, J.); *Bd. of Comm'rs v. Tenn. Gas Pipeline*, LLC, No. 13-5410, 2014 WL 2943602 (E.D. La. June 27, 2014) (Brown, J.). As in those cases, the relationship between the injuries in this case and the activities that cause them and any operations on the OCS is simply too remote and attenuated. Exercising jurisdiction in this manner would give federal courts jurisdiction over virtually any oil or gas dispute regardless of its relationship to OCS operations.

In sum, because Defendants cannot establish that the activities that caused the injury constituted an operation "conducted on the outer continental shelf," jurisdiction fails without consideration of the Fifth Circuit's "but for" test. The Court does not decide that OCSLA jurisdiction can never attach when the injury causing acts and the damage are sustained off the shelf, if the connection to offshore operations is strong enough. *See, e.g., Ronquille v. Aminoil Inc.*, *supra*. But in this case the "mere connection" between the claims asserted and an OCS operation is "too remote" to establish federal jurisdiction. *Deepwater Horizon*, 745 F.3d at 163 (quoting *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350

(5th Cir. 1999)).

### 3)   General Maritime Law

Defendants' contentions on this ground for removal are based on two premises, both of which are potential impediments to jurisdiction. The first premise—that these claims arise under admiralty law—is dubious when applied to this entire action. The second premise—that maritime claims are now removable to federal court—is contrary to clear United States Supreme Court precedent and the law of this circuit.

A two part test is used to determine whether maritime law applies to a claim—location or maritime situs (on navigable water) and connection with maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). For tort actions, a court applying the location test must determine whether the tort occurred on navigable water or whether an injury suffered on land was caused by a vessel on navigable water. *Id.* (citing 46 U.S.C. App. § 740). The connection test raises two issues. First the court must "assess the general features of the type of incident involved," to determine if it has "a potentially disruptive impact on maritime commerce." *Id.* (quoting *Sisson v. Ruby*, 497 U.S. 358, 363 & 364 n.2 (1990)). Second, the court must determine whether "the general character" of the activity giving rise to the incident shows a "substantial relationship to traditional maritime activity." *Id.*

The connection prong is very important because the law is clear in that locality (on navigable water) alone is not sufficient to trigger maritime law. *See Barker*, 713 F.3d at 215 (citing *Hufnagel*, 182 F.3d at 351). This part of the test looks to whether the activity on navigable waters is "so closely related to activity traditionally subject to admiralty law that

the reasons for applying special admiralty rules would apply in the suit at hand." *Barker*, 713 F.3d at 215 (quoting *Grubart*, 513 U.S. at 539-40). In applying this test courts look generally to the activity giving rise to the suit. *Id.* (citing *Sisson*, 497 U.S. at 365).

The question of whether maritime law applies to a claim is an extremely fact-intensive one that cannot be applied across the board to this entire action. Some of the permit violations might not have occurred on navigable water, even if the specific activity involved was maritime in nature. Or for those violations that did occur on navigable water, the activity involved might not satisfy the connection test. For some claims, the vessel status *vel non* of a drilling rig might be important. The determination of whether maritime law applies to a claim is a very claim specific, fact intensive inquiry and the Court is persuaded that this showing cannot be made across the board for the Petition.

But even if every claim asserted in the Petition arises under maritime law, the action is not removable. Defendants' arguments in support of removing maritime claims are grounded on the 2011 amendments to the removal statute and the contention that those amendments changed the law regarding the removability of admiralty cases. The Court rejected this legal argument in *Perrier v. Shell Oil Co.*, No. 14-490, 2014 WL 2155258 (E.D. La. May 22, 2014) (Zainey, J.). This Court does not agree that the 2011 amendments to § 1441 eliminated the long-held requirement of diversity jurisdiction in "saving to suitors" cases filed in state court.[26] The Court is certain that if Congress had intended to open the federal courts to an entirely new class of cases that had historically been excluded "we can hardly suppose that it would have failed to use some appropriate language to express that

---

[26] The Fifth Circuit may very well be unpersuaded too. *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208 (5th Circuit 2013).

intention." *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107 (1941); *see also Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund*, 500 U.S. 72, 82 (1991) (doubting the Congress would confer removal authority obliquely). While other district courts have been persuaded to recognize a change in the law, every other judge in this district to consider the issue has rejected it. *See, e.g., Yavorsky v. Felice Navig., Inc.*, No. 14-2007, 2014 WL 5816999 (E.D. La. Nov. 7, 2014) (Lemmon, J.); *Bisso Marine Co. v. Techcrane Int'l, LLC*, No. 14-375, 2014 WL 4489618 (E.D. La. Sept. 10, 2014) (Feldman, J.); *Riley v. LLOG Explor. Co.*, No. 14-437, 2014 WL 4345002 (E.D. La. Aug. 28, 2014) (Milazzo, J.); *Gregoire v. Enter. Marine Servs.*, LLC, No. 14-840, 2014 WL 3866589 (E.D. La. Aug. 6, 2014) (Duval, J.); *Grasshopper Oysters, Inc. v. Great Lakes Dredge & Dock, LLC*, No. 14-934, 2014 WL 3796150 (E.D. La. July 29, 2014) (Berrigan, J.).

In sum, Defendants have not established that maritime law provides a basis for removal.

### 4)     Federal Question (Federal Enclave)

The Operational Area comprises seven oil and gas fields. Defendants point out that three of the fields at issue in this action—Delta Duck Club, Raphael Pass, and Romere Pass—are located within the Delta National Wildlife Refuge ("DNWR"), which they contend is a "federal enclave." Defendants argue that this action is removable because the Parish is making claims based on permits pertaining to activities in those federally-owned areas.

Unlike OCSLA, federally-owned lands do not have their own congressional grant of federal court subject matter jurisdiction and choice of law. Accordingly, with federal enclave jurisdiction, removal must occur through the general removal statute, 28 U.S.C. § 1441(a),

*supra*, which requires *original* subject matter jurisdiction. The species of original subject matter at issue for federal enclave jurisdiction is federal question pursuant to 28 U.S.C. § 1331. Section 1331 vests the district courts with original jurisdiction of "all civil actions **arising under** the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (emphasis added). Thus, to defeat the Parish's motion to remand the removing Defendants must establish that the Parish's CZM Laws claims actually arise under federal law.

When the United States acquires land, the mere ownership and use of that land by the United States is not sufficient in and of itself to confer federal question jurisdiction over claims that arise on that property. *See James v. Dravo Contract. Co.*, 302 U.S. 134, 141-42 (1937) (citing *Surplus Trading Co. v. Cook*, 281 U.S. 647, 650 (1930)) (noting that ownership and use do not necessarily withdraw lands from the jurisdiction of the state). In order for federal law to control to the exclusion of state law, the United States must have obtained exclusive jurisdiction of the property when it obtained it from the State. *See Surplus Trading*, 281 at 651; *Chicago, Rock Island & Pacific Ry. Co. v. McGlinn*, 114 U.S. 542 (1885). When the United States has exclusive jurisdiction of land, state law claims—to the extent that they remain conizable in light of plenary federal control—are treated as if they arise under federal law for purposes of subject matter jurisdiction. *See Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952).

The question whether the United States has exclusive jurisdiction of land is determined by the way in which the United States obtained ownership of the land. There are several ways in which the United States can acquire or hold land within the limits of a state. *Williams v. Arlington Hotel Co.*, 22 F.2d 669, 670 (8th Cir. 1927) (citing *Ft. Leavenworth R. Co. v. Lowe*, 114 U.S. 525 (1885)). Those means of acquisition include the cession of land

42

from the state pursuant to Article I, § 8, cl. 17 (hereinafter "Clause 17") of the United States Constitution, and the purchase of land from private parties. *Id.* Clause 17 only applies to land acquired for certain government purposes but a state can also cede land to the United States for purposes outside of Clause 17's coverage.[27] *See Collins v. Yosemite Pk. & Curry Co.*, 304 U.S. 518, 529 (1938). Exclusive jurisdiction, which involves the complete transfer of sovereignty from the state to the United States, only occurs if the acquisition is pursuant to Clause 17 of the Constitution or if the state cedes the land to the United States via an agreement between the sovereigns that includes the state's transfer of exclusive jurisdiction to the United States. *See James Stewart & Co. v. Sadrakula*, 309 U.S. 433 (1940); *Collins*, 304 U.S. at 530. If the land is acquired in any other manner the United States holds it merely as a proprietor with the state retaining sovereign jurisdiction. *Williams*, 22 F.2d at 670 (citing *Ft. Leavenworth R.R.*, 114 U.S. at 525). When the United States' jurisdiction is merely proprietary, the lands remain part of the state's territory and within the operation of its laws, subject to the restriction that the state cannot interfere with the use of the land for federal governmental purposes. *Surplus Trading Co.*, 281 U.S. at 650; *James*, 302 U.S. at 141-42; *Williams*, 22 F.2d at 670.

Exclusive jurisdiction means that the state can no longer legislate with respect to the land or regulate it absent specific congressional authority to do so. *Black Hills Power & Light Co. v. Heartland Consumers Power Dist.*, 808 F,2d 665, 668 (8th Cir. 1987) (citing *Paul v. United States*, 371 U.S. 245, 263 (1962)); *see also Morgan v. Rankin*, 436 Fed. Appx.

---

[27]   Two other methods of acquisition are not at issue in this case: The United States can acquire ownership via its condemnation powers and by retaining ownership of public land when a state is admitted into the union. *Williams*, 22 F.2d at 670 (citing *Ft. Leavenworth R. Co.*, 114 U.S. at 525).

365 (5th Cir. 2011) (unpublished) (observing that any state law created after Fort Bliss became a federal enclave has no effect there). Conversely, state laws that were in effect when the United States acquired the land from the state continue in effect until they are either abrogated or changed by Congress. *See Chicago, Rock Island*, 114 U.S. at 546.

This latter principle of the continuity of existing state law is well-illustrated by *Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952). The plaintiff in *Mater* had sustained personal injuries on the property of Fort McPherson in Georgia. The plaintiff sued the defendant in federal district court under the state's substantive law of negligence. The district judge dismissed the action for lack of subject matter jurisdiction because the parties were not diverse in citizenship.  The plaintiff appealed and the Fifth Circuit reversed after concluding that the United States had exclusive jurisdiction over Fort McPherson. *Id.* at 125.

The appellate court began by noting that the United States had acquired the land from the state pursuant to Clause 17 of the Constitution. *Id.* at 123. The court then turned to the act pursuant to which the Georgia legislature had ceded the state's jurisdiction to the United States. *Id.* The act was a complete transfer of sovereignty to the United States except that the state retained concurrent jurisdiction for the service of state process and the regulation of public utilities on the land. *Id.* It was clear that the United States had obtained exclusive jurisdiction when it acquired the land for Fort McPherson from the state of Georgia. *Id.* at 123-24.

Given that the United States had exclusive sovereign jurisdiction of Fort McPherson, the next question the court addressed was whether the plaintiff's state law negligence cause of action was cognizable. Applying *Chicago, Rock Island, supra*, the court explained that absent action by Congress, state laws that were in effect when the United States acquired

44

Fort McPherson, to the extent that they were not inconsistent with the laws of the United States, remained in effect. *Id.* at 124. The plaintiff's cause of action was therefore preserved. But even more important, when the United States obtained exclusive jurisdiction, those extant state laws became operative as adopted federal laws. *Id.* at 124. Consequently, the district court had original federal question jurisdiction over the plaintiff's claims because those claims were now brought under federal law, even though substantively they were governed by state law.[28] *Id.*

To the extent that Defendants rely on *Mater* for the proposition that federal question jurisdiction exists in this case that reliance is misplaced. Louisiana's CZM Laws were enacted long after the United States acquired the federal lands at issue in this case, which occurred sometime around 1940. Assuming *arguendo* that the United States did obtain exclusive jurisdiction upon acquiring the lands in the DNWR, the CZM Laws, which were not yet enacted, could not have been incorporated into federal law as in *Mater* for purposes of creating federal question jurisdiction over this action. And in order for the post-acquisition CZM Laws to be enforceable at all in the DNWR, Congress would have had to expressly authorize the State to legislate in that area *if the United States obtained exclusive jurisdiction of the land.*[29]

Several more general principles derive from the controlling jurisprudence pertaining

---

[28] *Mater* also clarified that exclusive jurisdiction for purposes of Clause 17 does not pertain to the jurisdiction of federal courts. 200 F.2d at 125. As with most other federal question cases under § 1331, the state courts have concurrent jurisdiction. *Id.*

[29] If exclusive jurisdiction applies, the Parish would have to establish that Congress authorized the State to legislate in the DNWR or at some point passed legislation to adopt the CZM Laws as surrogate federal law. The implication of exclusive jurisdiction vested in the United States and the absence of such Congressional authorization would mean that the State's CZM Laws are actually without effect in the DNWR and therefore unenforceable in this action.

to federal enclave jurisdiction. It is clear that a "federal enclave," as that term is used for purposes of § 1331 federal question jurisdiction over state law claims, is not merely land that the United States owns within a state. Rather, federally-owned land located within a state is a "federal enclave" for purposes of jurisdiction when the United States obtains ownership of the land *and a transfer of sovereign jurisdiction from the state*. It is the State's relinquishment of sovereignty and cession of jurisdiction to the United States that transforms state law causes of action into federal ones as in *Mater*. The State's sovereign authority can only be ceded to the United States via a legislative act so the sale of land by a private owner without more does not transfer the State's sovereignty to the United States. Therefore, exclusive jurisdiction vests in the United States either by operation of law when Clause 17 of the Constitution applies, or via some type of negotiated cession agreement between the State and the United States.

The Removing Defendants rely on Clause 17 of the Constitution as the source of the United States' exclusive jurisdiction over the DNWR. Clause 17 states:

Congress shall have the power—

> To exercise ***exclusive Legislation*** in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like authority over all Places ***purchased by the Consent of the Legislature of the State*** in which the Same shall be, ***for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings***.

U.S. Const., art. I, § 8, cl. 17 (emphasis added). "Exclusive Legislation" means exclusive jurisdiction in the sense of exclusive sovereignty. *Mater*, 200 F.2d at 123 (citing *Surplus Trading*, 281 U.S. at 652). Applying Clause 17 in this case is complicated by the potential

application of 40 U.S.C. § 3112, which imposes a significant change in how exclusive

jurisdiction is determined for acquisitions after 1940, which is when the law became

effective. Section 3112, entitled Federal Jurisdiction, provides:

> (a) Exclusive jurisdiction not required.--It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires.

> (b) Acquisition and acceptance of jurisdiction.--When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. **The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.**

> (c) Presumption.--**It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section.**

40 U.S.C. § 3112 (emphasis added). Thus, for acquisitions after 1940, there is no exclusive

federal jurisdiction without a formal federal acceptance and express assumption of

jurisdiction by the United States pursuant to § 3112(b). Moreover, the statute actually

creates a conclusive presumption against jurisdiction. *Id.* § 3112(c).

Considering both Clause 17 and § 3112 together, for federal enclave jurisdiction to

exist in this case, the Removing Defendants must establish 1) that the United States acquired

the land for the purpose of erecting forts, magazines, arsenals, dock-yards, or other needful

buildings; 2) the state legislature consented to the jurisdiction of the federal government;

and 3) that the United States affirmatively accepted exclusive jurisdiction in accordance with

§ 3112 if the property was acquired after 1940. *Wood v. Am. Crescent Elev. Corp.*, No. 11-397, 2001 WL 1870218, at *2 (E.D. La. May 16, 2011) (Zainey, J.) (citing *Paul v. United States*, 371 U.S. 245, 264 (1963); 40 U.S.C. § 3112(b)).

Consent, and therefore the transfer of sovereign jurisdiction when the United States acquires land in Louisiana pursuant to Clause 17, is not contested in this case in light of La. R.S. § 52:1.[30] Further, it is undisputed that the United States has not complied with the procedures outlined in § 3112 in order to affirmatively accept jurisdiction of the DNWR from the State of Louisiana. Thus, the propriety of exercising federal enclave jurisdiction in this case turns on whether the United States acquired the land for the purpose of erecting forts, magazines, arsenals, dock-yards, or other needful buildings, *i.e.*, whether Clause 17 applies, and whether Defendants can establish that the land was acquired before § 3112 became effective in 1940.

Clearly, the United States did not acquire the land located in the DNWR for the purpose of erecting a fort, magazine, arsenal or dockyard, or any other type of "building." Defendants argue that Clause 17 applies nonetheless because the phrase "needful buildings" is interpreted broadly to include whatever structures are necessary in the performance of the functions of the federal government, and that the phrase has been applied to national parks. (Rec. Doc. 46, Opposition at 48 & n.56). Citing *Collins, supra*, Defendants contend that the

---

[30]  "The United States, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property." La. R.S. § 51:1(A). This statute notwithstanding, after 1940 jurisdiction does not pass to the United States unless it complies with § 3112. *See Adams v. United States*, 319 U.S. 312, 315 (1943).

Supreme Court has extended enclave jurisdiction to national parks and that the same rationale should apply to wildlife refuges. (Rec. Doc. 68, Defendants' Post-Hearing Brief at 8-9).

Defendants' argument fails to appreciate that any piece of federal property, including undeveloped land, can be a "federal enclave" for purposes of federal jurisdiction when the United States obtains exclusive jurisdiction of the property. That national parks such as Yosemite and Yellowstone, which Defendants equate to a wildlife refuge like DNWR, are acknowledged federal enclaves, proves nothing for this case unless the United States obtained exclusive jurisdiction of those federal properties by operation of law pursuant to Clause 17 of the Constitution. Defendants' reliance on *Collins* is misplaced because *Collins* is not a Clause 17 acquisition case. The United States acquired Yosemite National Park along with exclusive jurisdiction of that property from the State of California through a series of state and federal legislative acts. 304 U.S. at 527. Clause 17 became an issue in the case because state regulatory authorities claimed that the United States lacked exclusive jurisdiction over the park because the land was *not* being used for a purpose defined in Clause 17. *Id.* at 528. The Supreme Court rejected the contention that Clause 17 is the sole basis for the United States to obtain exclusive jurisdiction—Supreme Court precedent recognized that a state and the federal government can reach cession agreements to transfer land and sovereignty, which is what had occurred with respect to Yosemite. *Id.* at 528-29. And more to the point, the United States can acquire land *for purposes other than those specified in Clause 17. Id.* at 528. Thus, not only is *Collins* irrelevant to the issue of whether a wildlife refuge like the DNWR falls under Clause 17, the opinion actually suggests that a

national park might be a "purpose" outside the scope of Clause 17.[31]

Defendants urge a broad interpretation of Clause 17. They point out that in *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369 (1964), the Supreme Court recognized that "purchased" as used in Clause 17 could include donations. Defendants rely on *James v. Dravo Contracting Co., supra,* for the proposition that Clause 17's "other needful buildings" is to be interpreted broadly. In *James*, the Supreme Court rejected the proposition that structures such as locks and dams on waterways could not constitute "needful buildings" because those structures, even if "buildings," were not military in nature such as forts, magazines, arsenals, and dockyards, which are expressly named in Clause 17. *James*, 302 U.S. at 142. The Court reasoned that such a narrow construction of "needful buildings" was neither required nor supported by sound reason in light of the nature and functions of the government that the Constitution established. *Id.* Noting that court buildings, custom houses, and post offices had previously been recognized as "needful buildings," the Court construed "the phrase 'other needful buildings' as embracing whatever ***structures*** are found necessary in the performance of the functions of the federal government." *Id.* at 143 (emphasis added).

*Collins* and *James* make clear that Clause 17 pertains to the "purposes" identified in its text. Nothing in those decisions suggests that Clause 17 is to be so broadly construed so as to ignore the textual "building" or jurisprudential "structures" requirement. In fact, the

---

[31] Defendants also cite the decision in *Olig v. Xanterra Parks & Resorts, Inc.*, No. 13-15, 2013 WL 3936904 (July 30, 2013), for the proposition that a national park can be a federal enclave. But again, exclusive jurisdiction of the park at issue in this decision (Yellowstone National Park), passed by a series of legislative acts, including 16 U.S.C. § 24, in which Congress expressly took exclusive jurisdiction of the park from the states of Idaho, Montana, and Wyoming.

Supreme Court has suggested that the relinquishment of a state's sovereign jurisdiction over its own lands is not to be taken lightly. *See Silas Mason Co. v. Tax Comm'n of State of Wash.*, 302 U.S. 186, 199 (1937). And while the Supreme Court has been willing to construe Clause 17 broadly at times, all of the Court's decisions are remarkably consistent in the level of solicitousness that they show for a state's sovereign jurisdiction. Moreover, the "intensely local" nature of this litigation counsels against creating new jurisdictional exceptions in order to retain jurisdiction over this matter and ultimately deprive the sovereign state of the right to adjudicate its own controversies. *See Camsoft Data Systems*, 756 F.3d at 339.

Defendants cite to no case in which Clause 17 has been applied to something other than an edifice or structure of some sort, much less undeveloped land like the DNWR, and the Court is aware of no such case. The Court holds that the United States did not obtain exclusive jurisdiction pursuant to Clause 17 of the Constitution when it acquired the lands that compose the DNWR because it does not qualify as an "other needful building" as that requirement has previously been interpreted by the federal courts.

Although the Court bases it conclusion regarding federal enclave status on a question of law, the Court notes the United States' own treatment of the DNWR appears to be consistent with the State having retained sovereignty over the DNWR. The DNWR was created by Executive Order No. 7229, which was signed by President Roosevelt in 1935. No party in this case alluded to the content of that Order but it in no way suggests that the United States was taking the original 8,000 acres that were used to create the DNWR with a transfer of the State's sovereignty.[32] Defendants point to no act of Congress that changed the

---

[32] The Order states in relevant part:

[I]t is ordered that the following-described lands, consisting of 8,000 acres, more or

jurisdictional status of the DNWR in the nearly 80 years since its creation.[33]

Moreover, the State has apparently been enforcing the CZM Laws in the DNWR for decades without interference from the federal authorities. Given that Defendants point to no oil and gas leases issued by the federal government in the DNWR, the Court assumes that the State of Louisiana, not the United States, has granted the oil and gas leases in that area. And an inventory report prepared by the General Services Administration indicates that the United States only considered its jurisdiction in the DNWR to be proprietary in nature."[34] (Rec. Doc. 55-6 Exhibit F, Inventory Report on Jurisdictional Status of the Federal Areas within the States as of June 30, 1962).

In sum, Defendants have not established that the DNWR is a federal enclave for purposes of exercising federal question jurisdiction.

## V.    Conclusion

Defendants have not established that this action was properly removed from state court under diversity jurisdiction, OCSLA, maritime law, or federal question (federal

---

less, which the United States has contracted to purchase and now possesses with the right of use and occupation, in Plaquemines Parish, Louisiana, be, and they are hereby reserved and set apart for the use of the Department of Agriculture, subject to valid existing rights, as a refuge and breeding ground for migratory birds and other wildlife.

Signed by President Franklin D. Roosevelt, November, 1935. (Attached). The Court thanks Ms. Amy Hale-Janeke , Head of Reference Services at the Fifth Circuit Court of Appeals Library, for her diligence and tenacity in locating a copy of the Order.

[33]  Although the DNWR was created in 1935, the United States continued to acquire land for the refuge. The Parish asserts that some of the lands at issue in this action were obtained as late as 1942.

[34] That report defines "Proprietorial Interest Only": "This term is applied to those instances where the Federal Government has acquired some right or title to an area in a State, but has not obtained any measure of the State's authority over the area . . . ." (Rec. Doc. 55-6 Exhibit F p.20).

enclave). The Court therefore GRANTS the Motion to Remand. This matter is REMANDED to the state court from which it was removed pursuant to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction.

December 1, 2014

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE